# UNITED STATES DISTRICT COURT
### for the
### Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>Black in Color iPhone with Cracked Screen, ATF Exhibit 008, Currently Located at 1801 Stanley Road, Greensboro, North Carolina 27401 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:19MJ338-1

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. 371 | Conspiracy to Interfere with Commerce by Threats or Violence |
| Title 18 U.S.C. 1951 | Interference with Commerce by Robbery |

The application is based on these facts:

See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael B. Newsome, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/10/19 8:45 AM

_____
*Judge's signature*

City and state: Durham, North Carolina

Joe L. Webster, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Michael B. Newsome, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since May 2017. I am a graduate of the Federal Law Enforcement Training Center ("FLETC") Criminal Investigator Training Program, as well as the ATF National Academy, where I received extensive training in the investigation of firearms, controlled substances, arson, and explosives offenses. I have participated in investigations involving all of these areas. Prior to my career with ATF, I worked for the Rocky Mount Police Department in North Carolina for approximately nine and a half years. During my tenure with the Rocky Mount Police Department, I served as a duly sworn Task Force Officer with ATF from 2014 – 2017. During my career in law enforcement, I

have conducted numerous complex case investigations involving federal and state firearms and controlled substance violations. During the course of these investigations, I have obtained multiple federal and state search warrants authorizing the examination of electronic devices. I have also had the opportunity to examine the contents of these devices which has resulted in the seizure of evidence relevant to my investigations. Prior to my career in law enforcement, I attended North Carolina State University and graduated in 2007 with a Bachelor of Arts Degree in Criminology.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is a black color iPhone with cracked screen, unknown model number, unknown serial number, hereinafter the "Device." The Device is currently located at 1801 Stanley Road, Greensboro, North Carolina 27401. It has been submitted into evidence as ATF Exhibit 008.

5. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

2

## PROBABLE CAUSE

1. On November 5, 2018 at approximately 2:36 p.m., the Greensboro Police Department responded to a robbery in progress at the Quick Cash Pawn located at 2707 S. Elm-Eugene St. Greensboro, NC. The call was in response to a panic alarm that had been activated by one of the employees inside of the business. Officers arrived on scene and made contact with three employees who were working at the time the robbery occurred. No patrons were inside of the store or victimized by this robbery. Employees stated that at approximately 1:55 p.m. two black males in their early 20's entered the pawn shop and requested to see some handguns. One of the black males produced a Washington, D.C. identification card, per store policy, in order to physically handle the firearms. The sale's associate could not remember any other details about the identification card, only that it was from Washington, D.C. The black male inquired about purchasing one of the firearms. The sales associate informed him that he would need a North Carolina identification card in order to purchase a firearm. Both black males left the business at that time.

2. The two black males returned to the pawn shop at approximately 2:30 p.m. While one of the black males began speaking to a sales associate, the second black male produced a handgun from a bag that he was wearing across his chest. The employees described the firearm as either a Tec-9 or Mac-10 style handgun. The suspects demanded that the store manager unlock the glass display case where handguns were kept. The suspects began to remove firearms from the display case and place them into the bag that was carried by one of the suspects. They also

3

demanded all of the AK-47 magazines that were hanging on a wall rack behind the counter. Before leaving, the suspects stole approximately $1,800.00 in currency from the cash register and took two of the employees' cell phones. The employees were told to lie down on the ground as the suspects exited the business.

3.      An inventory by ATF Industry Operation Investigators revealed that the suspects stole twenty-one (21) handguns and two (2) pistol grip shotguns from the business. All of these firearms were entered into the National Crime Information Center (NCIC) as stolen.

4.      Quick Cash Pawn is a Federal Firearms Licensee (FFL) who conducts business with firearms dealers located outside of the state of North Carolina. Based upon my training and experience as an Interstate Nexus Examiner, I am able to determine by examination of the list of stolen firearms that all of these firearms were manufactured outside of the state of North Carolina. Therefore, I believe that the armed robbery of Quick Cash Pawn, a licensed firearms dealer, was in and affecting interstate and/or foreign commerce.

5.      On March 20, 2019, I received a phone call from ATF Special Agent (SA) Matt Leonard who is assigned to the Hyattsville, Maryland Field Office. SA Leonard advised that he had just conducted a proffer interview with a cooperating witness (CW). SA Leonard advised that the CW is out of custody while waiting to be sentenced on a case being prosecuted by Prince George County, Maryland. SA Leonard stated that during this proffer, the CW had provided information on a robbery of a gun dealer located in North Carolina.

4

6. SA Leonard stated that the CW had identified two individuals who were responsible for this robbery. The CW identified these individuals by their street names, "Ray" and "Wan". The CW also provided Instagram names for both individuals. The CW identified Ray's Instagram name as "ray_dawgg" and Wan's Instagram name as "dbwanoo_". The CW advised that he had become acquainted with these individuals while hanging out at a local strip club called The Ebony Inn in Fairmount Heights, Maryland. The CW was also able to provide information on other associates of Ray and Wan, as well as places that they frequent. The CW has been shown photographs from the aforementioned Instagram accounts to confirm that they are the individuals whom the CW was referring to.

7. SA Leonard advised that the CW knew the FFL robbery occurred sometime around late October and the beginning of November 2018 in North Carolina, but was unsure of the exact location. The CW advised that Ray and Wan had confessed that they committed this robbery. Specifically, the CW told SA Leonard that Ray and Wan had confessed to stealing approximately twenty-five (25) firearms from the FFL and had forced the employees to lie down on the ground. The CW stated that Ray and Wan had sold the firearms in Maryland after committing the robbery. The CW stated that the firearms were sold in November 2018.

8. SA Leonard advised that after receiving this information, he had an ATF Intelligence Research Specialist (IRS) query all FFL robberies in North Carolina during that time period. The only robbery that fit the description provided

5

by the CW was the robbery of Quick Cash Pawn in Greensboro, North Carolina on November 5, 2018. It should also be noted that a total of twenty-three (23) firearms were stolen during this robbery, and that the employees were forced to lie down on the ground as the suspects exited the business.

9.     SA Leonard indicated that after receiving this information from the CW, he recalled a text message that was sent to him by a confidential and reliable informant (CI) in early November about a shipment of guns that had just arrived in Washington, DC. SA Leonard advised that the text message contained a picture of multiple firearms lying on a bed with tags still on them.

10.     SA Leonard was able to locate the picture message, which he forwarded to me. I reviewed the photograph and observed that there were approximately seventeen (17) handguns, two (2) pistol grip shotguns, and one (1) AK type pistol that were visible. I noted that the price tags were still on all of these firearms, as well as gun locks. By observation and review of these tags, as well as the physical characteristics of the weapons, I was able to identify the make and model of many of these firearms. I was then able to compare these make and model numbers to the list of firearms stolen from Quick Cash Pawn. I discovered that all of the firearms that I was able to positively identify were reported stolen during the robbery of Quick Cash Pawn on November 5, 2018.

11.     I also observed that the text message was sent on November 6, 2018 at 12:17 p.m. The caption with the message read, *"My man out da city said shipment*

6

*jus touch down."* It should be noted that this message was received by SA Leonard on the day after the robbery occurred in Greensboro, North Carolina.

12. After receiving this information from SA Leonard, I queried Instagram and located accounts for "ray_dawgg" and "dbwanoo_". The account for "ray_dawgg" was public and I was able to view several photographs on this page. The account for "dbwanoo_" was listed as private. I was only able to view the profile picture, which was a close up photograph of the account owner.

13. While reviewing the account for "ray_dawgg", I was able to locate multiple photographs of the individuals believed to be Ray and Wan. Some of these pictures depicted Ray and Wan together with large sums of currency. These photographs were time stamped in November and December 2018.

14. I compared the photographs of Ray and Wan on Instagram to the surveillance video of the robbery at Quick Cash Pawn. I noted that the physical characteristics of Ray and Wan were very similar to the physical characteristics of the suspects; however, due to the poor resolution of the surveillance footage and the positioning of the surveillance cameras, I was unable to obtain any quality facial profiles of the suspects.

15. Later on March 20, 2019, I was contacted by SA Leonard regarding the true identities of Ray and Wan. SA Leonard advised that he had utilized several law enforcement databases to locate their true identities. SA Leonard advised that Ray's real name was RAQUAN JOHN ZIMMERMAN (DOB 03/04/1996; FBI# D0064J06D) and Wan's real name was DAWAN RASHAWN SALTERS (DOB

7

11/25/1999; FBI# 7CCFDHPA8). SA Leonard had compared mugshot photographs of both individuals to their respective Instagram accounts in order to make this positive identification.

16.     SA Leonard also provided me with mugshot photographs of RAQUAN ZIMMERMAN and DAWAN SALTERS. I was able to compare the photographs to images posted under both Instagram accounts. I confirmed that RAQUAN ZIMMERMAN is the person portrayed as the owner of the Instagram account: "ray_dawgg". I also confirmed that DAWAN SALTERS is the person portrayed as the owner of Instagram account: "dbwanoo_". I have also learned that SALTERS has a second Instagram account under the name "_dbwanoo". This account is listed as public; however, I only observed one photograph of SALTERS on the timeline. I have determined that SALTERS appears to be the owner of this account as well.

17.     On March 21, 2018, I responded to Quick Cash Pawn and made contact with assistant manager, Kyle Lutterloh. Lutterloh was one of the victims of the robbery on November 5, 2018. I showed Lutterloh the photograph of the firearms that SA Leonard received from the CI. Lutterloh looked at the photograph and determined that they depicted the firearms stolen from the pawn shop on November 5, 2018. Lutterloh specifically recognized several of the firearms in the photograph, including the two (2) pistol grip shotguns and a performance model Smith & Wesson revolver. Lutterloh also identified the price tags on the weapons as belonging to Quick Cash Pawn. While at the business, I compared the price tags in the

8

photograph to price tags on firearms that were currently on display in the store. I observed that both appeared to be identical.

18.     After returning to my office on March 21, 2019, I began to gather intelligence on ZIMMERMAN and SALTERS. I learned that ZIMMERMAN is on probation in Maryland for a robbery conviction. I made contact with Prince George County Probation and Parole and discovered that ZIMMERMAN received a five (5) year suspended sentence for a Conspiracy to Commit Robbery conviction on July 11, 2017. ZIMMERMAN was sentenced to three (3) years of supervised probation. The address that ZIMMERMAN has reported to his supervising officer since September 2017 is 1404 Early Oaks Lane, Capitol Heights, Maryland. This residence is located just outside of Washington, DC. I conducted a driver's license query and determined that ZIMMERMAN has an active driver's license in Washington, DC. It should be noted that during the robbery of Quick Cash Pawn, one of the suspects displayed a Washington, DC identification card while asking to see a firearm. The employees were unable to recall the name on the identification card, only that it was issued in Washington, DC.

19.     The ATF Hyattsville Field Office has conducted surveillance at 1404 Early Oaks Lane, Capitol Heights, Maryland. During this surveillance, agents have observed a silver Lincoln sport utility vehicle parked at the residence bearing Virginia license plate: VYC6823. Virginia Department of Motor Vehicles records indicate that this vehicle is registered to Deidra Zimmerman, RAQUAN ZIMMMERN's mother. On April 2, 2019, agents observed RAQUAN ZIMMERMAN

9

arrive at 1404 Early Oaks Lane, Capitol Heights, Maryland driving the aforementioned vehicle. It should be noted during a canvass conducted by investigators following the robbery of Quick Cash Pawn, a witness advised that he observed the two suspects fleeing the area in a dark, gray mid-size sport utility vehicle.

20. On March 27, 2019, I presented an application for a search and seizure warrant to United States Magistrate Judge, Joe L. Webster, related to Instagram accounts: "ray_dawgg", "dbwanoo_", and "_dbwanoo". Judge Webster found that probable cause had been established for the issuance of this search warrant. I returned to my office on this same day and served Facebook with the signed search warrant.

21. On April 9, 2019, I received records from Facebook related to the aforementioned Instagram accounts. I began to review these records on April 10, 2019. I began by reviewing the records for Instagram accounts: "_dbwanoo" and "dbwanoo_", which I had previously identified as belonging to DAWAN SALTERS. I observed that SALTERS had registered these accounts with Instagram on December 13, 2018 and December 29, 2018, respectively. It appeared to me that "dbwanoo_" was the primary account used by SALTERS. In reviewing these records, I observed multiple pictures, as well as references to RAQUAN ZIMMERMAN. It should be noted that both of SALTERS' Instagram accounts were created over one month after the robbery occurred at Quick Cash Pawn in

10

Greensboro, North Carolina. As such, I was not able to locate any communications, posts, or references to the robbery of Quick Cash Pawn.

22.    Next, I began to review the records for Instagram account: "ray_dawgg", which I had previously identified as belonging to RAQUAN ZIMMERMAN. I observed that ZIMMERMAN had registered this account with Instagram on October 20, 2012. I began by reviewing photographs posted by ZIMMERMAN, some of which depicted he and SALTERS together with large sums of currency. I had previously observed many of the pictures while reviewing ZIMMERMAN's public Instagram account. The Instagram records indicated that these photographs were taken on November 21, 2018, just over two weeks after the robbery occurred at Quick Cash Pawn. I also noticed that the location information posted on Instagram associated with these photographs is listed as, "Ebony Inn Restaurant", which is consistent with the information provided to SA Leonard by the CW. I have confirmed with SA Leonard that the Ebony Inn Restaurant also operates as a strip club.

11



ray_dawgg • Follow
Ebony Inn Restaurant

ray_dawgg • Follow
Ebony Inn Restaurant

106 likes
ray_dawgg Really getting to it 🏆 And all thanks to God 🙏 We ain't living right some shit I'm taking to my death bed 😭 😩 💯

106 likes
ray_dawgg Really getting to it 🏆 And all thanks to God 🙏 We ain't living right some shit I'm taking to my death bed 😭 😩 💯

23.     I then began to review many of the "direct shares", or communications, between ZIMMERMAN and other Instagram users. I located a message sent by ZIMMERMAN on November 4, 2018 in which he informs another Instagram user that he is going to "North Carolina A&T". Later that same day, ZIMMERMAN informs another Instagram user that he is at "homecoming". ZIMMERMAN informs a third Instagram user later that same day that he is in "North Carolina". It should be noted that the robbery of Quick Cash Pawn occurred the following day, November 5, 2018.

24.     North Carolina A&T is a university located in Greensboro, North Carolina. Every year, North Carolina A&T holds an annual homecoming celebration which usually includes a football game, parade, concerts, and other

12

festivities. Generally, the homecoming event is a week-long celebration which culminates with the weekend football game. This event generally draws several thousand people to the city of Greensboro and surrounding areas.

25.     The 2018 North Carolina A&T homecoming football game and associated festivities were held during the weekend of November 3, 2018 through November 4, 2018. This corroborates the statements made by ZIMMERMAN on Instagram about being at North Carolina A&T for homecoming on November 4, 2018.

26.     In reviewing ZIMMERMAN's Instagram page, I searched for other references which would indicate that ZIMMERMAN may have visited North Carolina on unrelated occasions. Facebook had provided me with records pertaining to ZIMMERMAN's Instagram account beginning January 27, 2018 through March 27, 2019. Specifically, I utilized a search tool to query the Instagram records for the words "Carolina" and "Greensboro". I was unable to locate any other post or communication which would indicate that ZIMMERMAN had visited North Carolina at any other time during the period for which I had records.

27.     During my review of ZIMMERMAN's Instagram records, I observed multiple occasions throughout 2018 where he provided the number (202) 981-0442 to other Instagram users. The first time that I observed ZIMMERMAN inform another user that this was his number was during May 2018. The last time that I observed ZIMMERMAN inform another user that this was his number was on

13

November 7, 2018, two days after the robbery occurred at Quick Cash Pawn. Shortly thereafter, ZIMMERMAN begins informing Instagram users that he has obtained a new number. Through my investigation, I was able to determine that number to be (301) 979-3824. I have confirmed with the Maryland Probation Office that (301) 979-3824 is the mobile number that ZIMMERMAN is currently reporting to his supervising officer.

28. Separate from my review of ZIMMERMAN's Instagram records, I had previously identified (202) 981-0442 as a possible number for ZIMMERMAN. On March 22, 2019, I was informed by ATF SA Tyler Mensing, who is assigned to the Washington II Field Office, that he is currently investigating RAQUAN ZIMMERMAN's relative, Juan Zimmerman, for firearms trafficking. SA Mensing advised that during his investigation he had identified Juan Zimmerman as a potential straw purchaser. SA Mensing's investigation had also revealed that some of these straw purchases were believed to have been made by Juan Zimmerman at the direction of RAQUAN ZIMMERMAN. SA Mensing advised that he had identified (202) 981-0442 as RAQUAN ZIMMERMAN's mobile number during August 2018.

29. After receiving this information, I was able to determine that (202) 981-0442 is a mobile number carried by Metro PCS, also known as simply "Metro". Metro PCS is a prepaid wireless carrier brand which is owned and operated by T-Mobile. On March 26, 2019, I submitted a request to T-Mobile for the preservation of records related to mobile number (202) 981-0442.

14

30.     Based upon my review of ZIMMERMAN's Instagram records, and in conjunction with the information received from SA Mensing, I believe that (202) 981-0442 is the mobile number that was utilized by ZIMMERMAN for several months during 2018. Specifically, I believe that (202) 981-0442 is the mobile number that was utilized by ZIMMERMAN on November 5, 2018, which is the date that the robbery occurred at Quick Cash Pawn in Greensboro, North Carolina.

31.     On April 12, 2019, I presented an application for search and seizure warrant to United States Magistrate Judge, L. Patrick Auld, for historical telephone records related to mobile number (202) 981-0442. Judge Auld found that probable cause had been established for the issuance of this warrant. I served T-Mobile with the aforementioned search warrant on April 12, 2019.

32.     On April 16, 2019, I received historical telephone records from T-Mobile related to mobile number (202) 981-0442. According to my review of these records, I was able to determine that the user of this device, who is believed to be RAQUAN ZIMMERMAN, traveled from Chapel Oaks, Maryland to Greensboro, North Carolina on November 3, 2018. The user continued to make and/or receive phone calls utilizing various cell phone towers in and around Greensboro, North Carolina until November 5, 2018, which is the day the robbery occurred at Quick Cash Pawn.

33.     Additionally, I observed that a call was made with this device approximately fifteen (15) minutes before the robbery occurred utilizing a cell phone tower located approximately ½ of a mile from Quick Cash Pawn. Cell site

15

information associated with the calls made or received from this device indicate that the user begins traveling back toward Maryland shortly after the robbery occurs. The records reflect that the user of the device arrived back in Chapel Oaks, Maryland before midnight on November 5, 2018. I did not observe any other occasion where this device had been utilized in North Carolina during the time period for which I was provided records.

34.  Based upon my review of these records, and in conjunction with my investigation, I believe that the historical telephone records related to mobile number (202) 981-0442 corroborate the fact that the device associated with this account was primarily utilized by RAQUAN ZIMMERMAN. I also believe that the records reflect that ZIMMERMAN was in possession of this device at the time the robbery occurred at Quick Cash Pawn in Greensboro, North Carolina.

35.  After reviewing the records related to mobile number (202) 981-0442, I provided them to ATF Intelligence Research Specialist (IRS) Stacy Foster for further analysis. I requested assistance from IRS Foster in attempting to identify an accurate mobile telephone number for DAWAN SALTERS during the time period that the robbery occurred at Quick Cash Pawn. Based upon my investigation, I had learned that SALTERS obtained the mobile number (240) 722-2147 approximately one week after the robbery occurred.

36.  IRS Foster utilized several law enforcement databases to locate mobile numbers that have been previously associated with SALTERS. IRS Foster then cross referenced these numbers with the incoming and outgoing phone calls made or

16

received by ZIMMERMAN from September 2018 through November 2018. IRS Foster contacted me back on April 17, 2019, and advised that SALTERS appeared to be utilizing mobile number (240) 396-7595 at the time the robbery occurred.

37. Specifically, IRS Foster had determined that ninety-four (94) phone calls had been made between ZIMMERMAN and mobile number (240) 396-7595 between September 2, 2018 and November 10, 2018. IRS Foster advised that T-Mobile was the wireless carrier for this mobile number during November 2018, and that DAWAN SALTERS was listed as the subscriber on the account during that time period.

38. IRS Foster provided me with a spreadsheet detailing the communications between ZIMMERMAN and mobile number (240) 396-7595. I reviewed the spreadsheet and noted that there were no phone calls made between ZIMMERMAN and mobile number (240) 396-7595 on November 5, 2018 nor November 6, 2018. I believe that a possible explanation for the absence of any phone calls during this time period is because ZIMMERMAN and SALTERS were together at this time.

39. Based upon my investigation, and in conjunction with the information received from IRS Foster, I believe that (240) 396-7595 is the mobile number that was utilized by SALTERS from at least September 2018 through November 10, 2018. Specifically, I believe that (240) 396-7595 is the mobile number that was utilized by SALTERS on November 5, 2018, which is the date that the robbery occurred at Quick Cash Pawn in Greensboro, North Carolina.

17

40.     On April 18, 2019, I presented an application for search and seizure warrant to United States Magistrate Judge, Joe L. Webster, for historical telephone records related to T-Mobile, USA mobile number (240) 396-7595. Judge Webster found that probable cause had been established for the issuance of this warrant. I served T-Mobile with the search warrant on this same day.

41.     On April 22, 2019, I received historical telephone records from T-Mobile related to mobile number (240) 396-7595. After reviewing these records, I learned that DAWAN SALTERS was listed as the subscriber on this account from February 17, 2018 through November 9, 2018.

42.     Further review of the historical cell site information contained within these records revealed that the user of the device associated with this account traveled from Maryland to Greensboro, North Carolina on the evening of November 3, 2018. The user of this device continued to make and receive telephone calls that utilized towers in and around the city of Greensboro until November 5, 2018. The records indicate that sometime during the afternoon of November 5, 2018, the user of this device begins traveling back toward Maryland. The user of the device appears to arrive back in the area of Chapel Oaks, Maryland sometime before midnight on November 5, 2018.

43.     Based upon my review of these records, and in conjunction with my investigation, I believe that the historical telephone records related to mobile number (240) 396-7595 corroborate the fact that the device associated with this account was primarily utilized by DAWAN SALTERS. I also believe that the

18

records reflect SALTERS was in possession of this device at the time the robbery occurred at Quick Cash Pawn in Greensboro, North Carolina. Furthermore, after comparing these records to the records related to mobile number (202) 981-0442, I believe that ZIMMERMAN and SALTERS both traveled to Greensboro, North Carolina on November 3, 2018, and then returned to Maryland after the robbery occurred on November 5, 2018.

44.    On April 24, 2019, an investigator with the Greensboro Police Department presented two (2) photographic line-ups to Brandon Rucker, an employee of Quick Cash Pawn. Rucker was one of the three employees working at the time the robbery occurred on November 5, 2018. One of the line-ups contained a photograph of RAQUAN ZIMMMERMAN, and the other contained a photograph of DAWAN SALTERS. Rucker was first shown the line-up containing the photograph of ZIMMERMAN. Rucker did not pick ZIMMERMAN out of this line-up.

45.    Next, Rucker reviewed the line-up containing a photograph of DAWAN SALTERS. Rucker selected SALTERS with 100 percent confidence as one of the suspects. Furthermore, Rucker described SALTERS as the suspect who brandished the firearm during the robbery. Based upon my review of the surveillance footage of the robbery, I am of the opinion that the suspect who brandishes the firearm during the robbery is, in fact, DAWAN SALTERS. It should be noted that photographic line-ups have also been shown to other victims of the robbery which did not result in the positive identification of ZIMMERMAN and SALTERS.

46.    On April 26, 2019, Technical Surveillance Specialist (TSS) Michelle

19

Beltz, of the ATF Digital Forensics Branch, utilized specialized software to crop, enhance, and brighten images of the suspects from the Quick Cash Pawn surveillance video. On April 29, 2019, I received these enhanced images and video from TSS Beltz.

47. While reviewing these images, I observed that the taller of the two suspects, who I believe to be RAQUAN ZIMMERMAN, is wearing a very distinct jacket. This jacket has black sleeves which are shiny and appear to be made of a leather-like material. In contrast, the body of the jacket is a darker, matte black color and appears to be made of a cloth-like material. I also noticed that the jacket has very shiny silver zippers, including a vertical zipper on each of the two (2) chest pockets. It appears that ZIMMERMAN is wearing a light colored hooded sweatshirt underneath this jacket. ZIMMERMAN is also wearing a Chicago Bulls hat.

48. I also noticed that ZIMMERMAN is wearing a very distinct pair of athletic shoes during the robbery. The lower portion of these shoes appears to be either white or gray, while the top portion, including the tongue, appears to be black. There is a very noticeable, curvy transition between light and black color.





21

49. I then searched back through the records I obtained from ZIMMERMAN's Instagram account in an attempt to locate photographs of him wearing the same articles of clothing worn by him during the robbery. I was able to locate several pictures of ZIMMERMAN wearing what appears to be the same jacket. These photographs were posted in December 2018. I also located a photograph of ZIMMERMAN wearing this jacket which was posted in February 2018.



22

50.    I continued searching through ZIMMERMAN's Instagram records and located several photographs of ZIMMERMAN wearing what appears to be the same shoes as those worn by him during the robbery. These photographs were posted in August 2018. In one of the photographs, I was able to see the "Jordan" logo on the bottom of the shoe. Based upon my research of various models of Air Jordan shoes, I believe these to be Air Jordan 10 Retro.



51.    I have also reviewed ZIMMERMAN and SALTERS Instagram records in an attempt to locate any photographs of SALTERS wearing the same articles of clothing as those worn by him during the robbery. I have also searched for photographs of the shoulder bag used by SALTERS to conceal the firearm

23

brandished during the commission of the crime and subsequently stash the firearms stolen during the robbery.

52.    During my review of ZIMMERMAN's Instagram records, I located photographs of SALTERS wearing a thin, black toboggan. These photographs, which depicted SALTERS and ZIMMERMAN together, were posted in November 2018, shortly after the robbery occurred at Quick Cash Pawn. While there is nothing distinct or notable about this toboggan, it does appear identical to the toboggan worn by SALTERS during the robbery.



53.    On May 17, 2019, I presented an application for search and seizure warrant to United States Magistrate Judge Joi Elizabeth Parker requesting authorization to obtain and review records from Apple Inc. related to the Apple ID: dawan_salters1@icloud.com. Through my investigation, I was able to identify this

24

email account as being associated with DAWAN SATLERS Apple ID while reviewing records obtained from his Instagram account. Based upon my training and experience, I know that people who have created an Apple ID are able to utilize the iCloud to back up, store, and share files and other data associated applications on electronic devices.

54.     On May 31, 2019, I received the requested records from Apple related to SALTERS' Apple ID. Upon review of these records, I discovered that there were multiple images that had been backed up to SALTERS' iCloud Photo Library. During my review of these images, I was able to locate multiple photographs of the firearms stolen from Quick Cash Pawn in Greensboro, North Carolina. I was able to zoom in on one of these images and identify the item number on a price tag that was attached to one of the firearms. I confirmed that this item number was included on the list of firearms stolen from Quick Cash Pawn.

55.     On August 19, 2019, I traveled to the Fairfax County Detention Center in Fairfax, Virginia to conduct an interview with RAQUAN ZIMMERMAN. ZIMMERMAN was being detained at this facility on an unrelated charge. I presented the evidence obtained during the investigation to ZIMMERMAN and requested that he cooperate. ZIMMERMAN inquired as to who had implicated him in the robbery, but made no incriminating statements during this interview. ZIMMERMAN eventually walked out of the interview room and returned to his cell.

56.     On August 27, 2019, I presented evidence in this case to a federal grand jury in the Middle District of North Carolina. The grand jury returned an

25

indictment on RAQUAN ZIMMERMAN and DAWAN SALTERS for Conspiracy to Interfere with Commerce by Threats or Violence in violation of Title 18, U.S.C. § 371, Interference with Commerce by Robbery in violation of Title 18, U.S.C. § 1951(a), and Brandishing a Firearm During and in Relation to a Crime of Violence in violation of Title 18, U.S.C. § 924(c).

57.     On September 20, 2019, I assisted the ATF Hyattsville Field Office with serving the federal arrest warrant on DAWAN SALTERS in Bladensburg, Maryland. SALTERS was taken into custody without incident as he was reporting for work at Bates Trucking Company. SALTERS was searched incident to arrest and found to be in possession of a black in color iPhone with a cracked screen. Due to the damage to the phone, I was unable to verify the exact model. This device was seized at the time of SALTERS' arrest. It was subsequently submitted into evidence as ATF Exhibit 008.

58.     I also noted that at the time of SALTERS' arrest, he was wearing a thin black toboggan which appeared identical to the one worn by him at the time of the robbery of Quick Cash Pawn. This toboggan was also seized and submitted into evidence.

59.     After his arrest, SALTERS was transported to the ATF Hyattsville Field Office to be interviewed. SALTERS invoked his right to have counsel present prior to making any statements about the investigation. SALTERS also declined to give consent for his cellular phone to be searched.

60.     Based upon my investigation, I know that evidence related to the

26

robbery of Quick Cash Pawn has previously been backed up to SALTERS iCloud account in the form of photographs of the firearms stolen from Quick Cash Pawn. As such, I reasonably believe that additional evidence related to this investigation may be contained on the electronic device seized from SALTERS at the time of his arrest on September 20, 2019. I also believe that since ZIMMERMAN became aware of the pending indictment during my interview with him on August 19, 2019, there is a possibility that he relayed this information to SALTERS. Based upon my training and experience, communications between co-conspirators, both prior to and post indictment, often contains evidence of the offense under investigation. Being that ZIMMERMAN remains in custody, he would have had to communicate with SALTERS either through the jail phone system, in person visitation, or through a third party. I reasonably believe that evidence of these communications, if they exist, may be stored on SALTERS' cellular telephone.

## TECHNICAL TERMS

61.     Based upon my training and experience, I use the following technical terms to convey the following meanings:

> a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log,"

27

which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

28

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using

29

specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

62. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available

30

online at https://www.apple.com, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

63.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

64.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

> a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

31

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to

32

establish that a particular thing is not present on a storage.
medium.

65. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

66. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

33

## CONCLUSION

67.    I respectfully submit that this affidavit supports probable cause for a

search warrant authorizing the examination of the Device described in Attachment

A to seek the items described in Attachment B.

Respectfully submitted,

Michael B. Newsome
Special Agent
Bureau of Alcohol, Tobacco, Firearms
and Explosives

Subscribed and sworn to before me
on October 10, 2019:    8:45 A.M.

HONORABLE JOE L. WEBSTER
UNITED STATES MAGISTRATE JUDGE

34

## ATTACHMENT A

1.      The property to be searched is a black color iPhone with cracked screen, unknown model number, unknown serial number, hereinafter the "Device." The Device is currently located at 1801 Stanley Road, Greensboro, North Carolina 27401.  It has been submitted into evidence as ATF Exhibit 008.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

I.    **Content to be searched by the government**

    a.  Text messages (SMS);

    b.  Picture messages (MMS);

    c.  e-mails;

    d.  direct messages and group communication messages sent using messaging apps;

    e.  social media applications utilized by the Device;

    f.  contacts and contact information in any address books;

    g.  phone numbers stored on the Device in address books and calls logs;

    h.  voicemails;

    i.  photographs;

    j.  videos;

    k.  Internet website history;

    l.  GPS navigation application history.

II.   **Particular things to be seized by the government**

All content described in Section I above that constitutes contraband, fruits, evidence, and/or instrumentalities of violations of Title 18 U.S.C. § 371, Conspiracy to Interfere with Commerce by Threats or Violence and Title 18 U.S.C. § 1951(a), Interference with Commerce by Robbery involving RAQUAN ZIMMERMAN and DAWAN SALTERS including:

36

a. Communications between RAQUAN ZIMMERMAN, DAWAN SALTERS, and others referencing the robbery of Quick Cash Pawn and related criminal activity;

b. Evidence indicating the disposition of any of the proceeds from the robbery of Quick Cash Pawn;

c. Evidence which may help identify any co-conspirators involved in the robbery of Quick Cash Pawn;

d. Photographs and videos related to possession and distribution of firearms stolen from Quick Cash Pawn;

e. Evidence of a scheme conspiracy between RAQUAN ZIMMERMAN, DAWAN SALTERS, and others to traffic, sell, or otherwise distribute firearms;

f. all bank records, account information, and other financial records that may contain evidence of firearms trafficking proceeds;

g. GPS coordinates and other stored location information revealing the location of the Device during the conspiracy from November of 2018 through the present;

h. website addresses visited and search engine searches and results, pertaining to the robbery of Quick Cash Pawn and related criminal activity;

i. any social media account information on the Device, as well as user names and passwords, and connections to other social media users;

37

j.  any of the above information stored on the Device, which was previously deleted, but recovered through forensic examination;

k.  Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.